IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 11, 2017

## STATE OF TENNESSEE v. DANIEL PEREZ

**Appeal from the Criminal Court for Shelby County**
**No. 15-04988      John Campbell, Judge**

_____

### No. W2016-02483-CCA-R3-CD

_____

The Defendant, Daniel Perez, was convicted of one count of aggravated robbery.  The Defendant argues: (1) that the evidence was insufficient to support his conviction, and (2) that the trial court erred in allowing the State to reference witnesses that the Defendant could have produced at trial.  Following our review, the judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton, Assistant Public Defender (on appeal); and Neil Umstead, Assistant Public Defender (at trial), for the appellant, Daniel Perez.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Olivia Brame, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### FACTUAL BACKGROUND

This case arose following the July 4, 2015 robbery of the victim, Jose Murguia.  Thereafter, the Shelby County Grand Jury charged the Defendant with one count of aggravated robbery.  See Tenn. Code Ann. § 39-13-402.  A trial began in the Criminal Court for Shelby County on September 12, 2016.

The victim testified that he was robbed "in the afternoon" on July 4, 2015, at the Prescott Place Apartments. He explained that he was "walking toward the store" located in his apartment complex and "turned around because" the store "didn't have the food that [the victim] ordered." The victim stated that he saw a "Ford F-150 black" truck near his apartment when he walked to the store and that the Defendant "was in the truck with his partner." The victim said that he "didn't think anything" about seeing the truck. However, as the victim was "walking back to [his] house[,]" the Defendant and another individual "jump[ed] out from the bushes[.]" The Defendant told the victim, "Don't move or we f—k you up." The victim said that he knew one of the individuals was the Defendant because the victim "turn[ed]" and looked "over [his] shoulder" and saw the Defendant. The victim said that he observed the Defendant holding a gun and that the Defendant placed the gun against the victim's head. The victim testified that he feared for his life and that he believed the two men would kill him. The victim claimed that one of the individuals removed his wallet from his pocket and took $150.00 from it. The victim explained that the two indivduals were standing behind him, so he was not able to see which one reached into his pocket. When asked what happened after the Defendant "put a gun to [the victim's] head and after someone took [his] wallet[,]" the victim stated, "They got into a truck. [The Defendant] drove -- and they drove off." The victim said that it was the same Ford truck he observed when he originally left his apartment.

The victim stated that he knew the Defendant prior to this incident. He explained that the Defendant was "around the apartments" where the victim lived "on Fridays and Saturdays[.]" The victim said that he had seen the Defendant at the apartment complex approximately three times prior to the robbery. Furthermore, the victim testified that the Defendant "was always driving" the black truck. Regarding the truck, the victim asserted, "It's [the Defendant's]." On-cross examination, the victim agreed that he had seen the Defendant "more than three or four times" at the apartment complex and agreed that he had never spoken to the Defendant.

Furthermore, the victim admitted that the only time he saw the Defendant's face was "when [he] turned around for those couple of seconds" during the robbery. Counsel for the Defendant asked the victim if he remembered being asked the following question during the preliminary hearing:

> Defense counsel: "After they threw the wallet down they then turned and ran away from you toward their truck; is that right?"
>
> The victim: "Yes, yes, because I saw them when they went toward the truck."

Defense counsel: "Okay. Your answer to that question was: Okay. They turned the truck on. I walked toward the hallway and I see them in the truck when they quickly pulled away. I saw his face."

The victim: "Yes. When they passed by with the truck and they came around, yes, I saw his face. I saw his face again."

Defense counsel: "Okay. But you testified the only time you saw him that day was when you turned your head and then when they ran off you never saw them again."

The victim: "When he put the gun toward my head . . . I turned around, I saw his face. And then when they drove off yeah, they passed by and I saw [the Defendant]."

The victim explained that after the robbery, he called the police. The following day on July 5, 2015, the victim went to the police station and gave a formal statement. While at the station, the victim identified the Defendant in a photographic lineup. The State provided the victim with a document, and the victim identified it as the photographic lineup he viewed on July 5, 2015. He agreed that he had circled a photograph of the Defendant and that his signature appeared on the document under a statement reading, "This is the person that robbed me with another person with tattoos."

Ernesto Vasquez testified that he was living at Prescott Place Apartments on July 4, 2015. Mr. Vasquez said that he remembered calling the police on July 4, 2015, due to the fact that he "saw a truck that seemed suspicious to [him] because it was driving around, coming in and out" of the apartment complex and "sometimes [the truck] sped up." Mr. Vasquez said that this occurred in the afternoon some time after 4:00 p.m. and that the truck was a black F-150. He explained that he took note of the truck's tag number and gave this information to the police that day when they arrived at the apartment complex. When asked if he observed any individuals in the truck, Mr. Vasquez responded, "The[re] were [a] few of them, three or four." He explained that the individuals were men and that he "didn't see [the men] that close[,] but [he thought] they were Hispanic."

Mr. Vasquez stated that on July 5, 2015, he went to the police station. At the station, he was shown a photographic lineup and identified the Defendant as the man driving the black F-150 truck. Mr. Vasquez also informed the police that he had seen the Defendant prior to July 4, 2015, driving the same black truck. The State provided Mr. Vasquez with a document, and Mr. Vasquez identified it as the photographic lineup he viewed on July 5, 2015. He agreed that he had circled a photograph of the Defendant and that his signature appeared on the document under a statement reading, "[T]he one

driving the black truck Ford F-150 before the robbery." Mr. Vasquez testified that he did not know the victim before July 4, 2015, and that he did not see the victim being robbed.

Officer Steven Grigsby testified that he was employed with the Memphis Police Department (MPD) and that he was working on July 4, 2015. Officer Grigsby stated that he received a call regarding a robbery at Prescott Place Apartments. Upon arrival at the scene, Officer Grigsby spoke to the victim and Mr. Vasquez, who were "talking about a robbery." After speaking with the two men individually, Officer Grigsby "learned that [the victim] had been robbed at gunpoint by two male Hispanics on the north side of his building in the Prescott Place Apartments." Officer Grigsby also said that Mr. Vasquez "provided a description of a black F-150 with Mississippi tags and gave [him] the tag." Officer Grigsby testified that he "was given [an] address, as well as the name of" the Defendant. Officer Grigsby went to that address that night but "did not locate the black F-150[,] so [he] followed up the next day." After speaking with a woman at this address, he learned that the Defendant "had an apartment in the Willow Place" complex. Officer Grigsby stated that he went to this apartment complex with his partner and "located a black F-150 with the tags that matched almost identically. It was one letter off." After speaking with "several pedestrians in the complex," Officer Grigsby was able to locate the Defendant in a particular apartment. Officer Grigsby testified that after finding the Defendant, he "transported him to Mt. Moriah General Assignment Bureau."

On cross-examination, Officer Grigsby confirmed that he never conducted a search of the Defendant's truck, nor did he "ever see any property or money in [the Defendant's] possession.

Detective Casey Amen testified that he was a detective for the MPD and that he was working in this capacity on July 5, 2015. Detective Amen said that he was working on the robbery case involving the victim. Detective Amen testified that the victim gave a statement regarding the robbery and identified the Defendant in a photographic lineup. Furthermore, Detective Amen stated that he spoke with Mr. Vasquez and that Mr. Vasquez identified the Defendant in a photographic lineup. Detective Amen also testified that he spoke with the Defendant after advising him of his Miranda[1] rights. Detective Amen asserted that the Defendant indicated to him that he undstood his rights and that the Defendant signed an "Advice of Miranda rights" form. The State provided Detective Amen a document, and he identified it as the form the Defendant signed. Detective Amen said that the Defendant told him "he was at the Prescott Place Apartments . . . to get some food" and "denied any involvement in any robbery." The Defendant agreed that he drove a black F-150 truck and that he was driving it on July 4, 2015. The Defendant told Detective Amen that he was at Prescott Place Apartments to

---

[1] See Miranda v. Arizona, 384 U.S. 436 (1966).

"visit a friend" or "a relative of some sort[,]" but the Defendant did not tell him much "about who that person was." Detective Amen stated, "That's all [the Defendant] said." He explained that the Defendant "didn't tell [him] much."

On cross-examination, Detective Amen testified that he "did not go to the scene of the robbery[,]" nor did he "knock on any doors [at Prescott Place Apartments] to try to find any witnesses who may or may not have seen what happened." Detective Amen testified that he attempted to get surveillance video from the apartment complex but was unsuccessful. Detective Amen agreed that he did not obtain search warrants for the black F-150 truck or the Defendant's residence. Detective Amen also confirmed that he did not listen to any 9-1-1 calls that were made regarding this case. Detective Amen stated that he did not take a written statement from Mr. Vasquez because "[h]e refused to give a statement" and "it was hard enough getting [Mr. Vasquez] to look at the lineup."

On re-direct examination, Detective Amen testified that at the time he began working on the case, the Defendant had already been located. Detective Amen also agreed that he was able to close this case quickly because the victim gave "a quick identification" of the Defendant, he had "a matched vehicle description to the tag" of the Defendant's black truck, and "Officer Grigsby had already been to the scene of the crime."

The Defendant testified that he was at the Prescott Place Apartments on July 4, 2015. He said that he was not living there at that time but asserted that he had lived there previously. The Defendant said that he was at the Prescott Place Apartments on July 4, 2015, to get a hair cut and explained that he regularly got his hair cut there. The Defendant said that he drove his black F-150 truck to the apartment complex and that two individuals were with him: Miguel and Tomas. The Defendant stated that he arrived at 6:45 p.m. and parked in front of the apartment of the man who cut his hair. The Defendant explained that he was not able to get his hair cut because the man was leaving the apartment complex. The Defendant said that he then decided to "get some bread" from "a truck parked there selling things." The Defendant said that "there were a lot [of people] at the truck and there was a man there playing with his children on a bicycle." The Defendant said he purchased "a sack of bread" for $5 and, shortly after, he and the two men left the apartment complex. The Defendant denied "driving around the apartment complex erratically" and had no idea "why [Mr. Vasquez] would say that."

The Defendant stated that he remembered the police coming to his residence the following day, July 5, 2015. He said that his "half-cousin[,]" Miguel, was at his apartment and opened the door when the police arrived. The Defendant explained that he saw Miguel's talking with the police and then the police placed the Defendant under arrest. The Defendant testified that he remembered speaking with Detective Amen at Mt.

Moriah but said that he was unaware that Detective Amen was a detective at that time. The Defendant said that he told Detective Amen that he had been at the Prescott Place Apartment complex on July 4, 2015, to get a hair cut. The Defendant stated that he informed Detective Amen that both his "half-cousin[,]" Miguel, and his brother-in-law, Tomas, were with him at the Prescott Place Apartment complex. The Defendant denied seeing the victim or Mr. Vasquez at the apartment complex. The Defendant also asserted that he never robbed the victim and claimed that neither he, Miguel, nor Tomas had a gun.

On cross-examination, the State asked the Defendant about the two men who were with him on July 4, 2015. The Defendant stated that their first and last names were Miguel Flores and Tomas Jimon. Counsel asked the Defendant if he gave police "the first and last names of the two people [he was] with on that day[,]" and the Defendant replied, "Yes." The State then asked, "Why aren't they here today?" The Defendant said that he did not know. The State asked him if he "heard Detective Amen's testimony that [the Defendant] didn't tell him who [the Defendant] was with" that day and that the Defendant "mentioned something about being with someone who may [have] be[en] a relative[.]" The Defendant affirmatively responded and replied, "I only said the name, first name[.]"

The Defendant also testified that Miguel Flores gave a statement to the police about what occurred on July 4, 2015. The State then asked the Defendant if he "ever told anyone that Miguel gave a statement to police." The Defendant replied no and agreed that the day of trial was the first day he had mentioned that Miguel gave a statement. The Defendant testified that he did not know the name of the man he went to see to have his hair cut, but he stated that the man's nickname was Banano. The Defendant agreed that prior to trial, he did not tell the investigating police officers Banano's name.

The State asked the Defendant why he did not tell the police Banano's name and why Banano was not testifying at trial. Defense counsel objected to these questions, and the trial court ruled that the State's questions were proper, and the prosecutor asked the Defendant why he had not called Miguel, Tomas, and Banano to testify. The Defendant replied, "I don't have anyone to talk with . . . . I've lost my whole family." The Defendant explained that he did tell his attorney about what happened and who he was with on July 4, 2015, and asserted that he did tell the police "[a]bout the other people . . . with [him] when the robbery took place." When asked again if he told the police the first and last names of the individuals with him, the Defendant replied, "I just told them the names Tomas and Miguel and that I went to get my hair cut."

The State called Detective Amen as a rebuttal witness, and he confirmed that he spoke with the Defendant on July 5, 2015. Detective Amen testified that he had asked

-6-

the Defendant "who he might have been with" that day and that the Defendant told him he was with "a relative of some sort . . . like a distant cousin." Detective Amen testified that he asked the Defendant for a name of this relative, but the Defendant provided neither a name nor an address for this individual. Detective Amen asserted that had the Defendant given it to him, he would have followed up on that information. Furthermore, Detective Amen testified that no one contacted him with any additional information regarding the Defendant and asserted that if someone had, he would have followed up on that information. Detective Amen testified that the Defendant never mentioned Miguel Flores, Tomas Jimon, or Banano. He also testified that the Defendant never mentioned "that he was going to get his hair cut at" Prescott Place Apartments on the day of the incident.

At the conclusion of the trial, the jury convicted the Defendant as charged, and the Defendant was sentenced to serve eight years' confinement in the Tennessee Department of Correction. The Defendant filed a timely notice of appeal, and the case is now before us for our review.

## ANALYSIS

### I. Sufficiency

The Defendant contends the evidence was insufficient to sustain his conviction for aggravated robbery. Specifically, the Defendant argues that the evidence was insufficient because the State proved "that [the Defendant] drove a black Ford F-150 truck[] but failed to conclusive[ly] pro[ve] that [the Defendant was] guilty of the offense of robbery." The State responds that the evidence was sufficient to support the Defendant's conviction. We agree with the State.

An appellate court's standard of review when the Defendant questions the sufficieny of the evidence on appeal is "whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914

(Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

"Direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[.]" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401. Aggravated robbery is robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402(a)(1).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). As relevant here, a person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2).

Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). To prove guilt through a theory of criminal responsibility the State must establish that the defendant "'knowingly, voluntarily and with common intent unite[d] with the principal offender[] in the commission of the crime.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

The identity of the perpetrator is an essential element of any crime. State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." State v. Sneed, 908 S.W.2d 408, 410 (Tenn.

-8-

Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

Here, there is sufficient evidence to support the Defendant's conviction for aggravated robbery. The victim testified that two men came at him from behind the bushes and robbed him at gunpoint. The victim claimed that one of the men placed the gun against his head and that the victim turned his head and saw the Defendant's face. The victim testified that he recognized the Defendant and that prior to the incident, he had seen the Defendant on multiple occasions at Prescott Place Apartments. Furthermore, the victim said that he saw the Defendant's driving away from the apartment complex in a black Ford truck, which he had observed the Defendant driving on multiple occasions prior to the robbery. Mr. Vasquez confirmed that the Defendant had been driving his black truck at Prescott Place Apartments, and the Defendant admitted to being there on the day of the robbery. Officer Grigsby responded to the scene and testified that the victim informed him that two men had robbed him at gunpoint and that Mr. Vasquez gave him the license plate number of the black Ford truck. Officer Grigsby tracked down this truck and discovered the Defendant at another apartment complex. Detective Amen testified that both the victim and Mr. Vasquez identified the Defendant in a photographic lineup. Detective Amen also testified that he took a statement from the Defendant and that the Defendant admitted to being at Prescott Place Apartments but did not give very much information. The Defendant testified and offered a different explanation for his presence at Prescott Place Apartments on the day of the robbery; however, it appears that the jury credited the State's proof rather than the Defendant's. See Bland, 958 S.W.2d at 659. Thus, the evidence is sufficient to support the Defendant's conviction for aggravated robbery, and he is not entitled to relief.

## II. Missing Witnesses

On appeal, the Defendant argues that the trial court erred in allowing the State to "cross-examine the [D]efendant regarding his failure to produce certain witnesses at trial" and that such error was not harmless. Specifically, the Defendant objected to the State's questions and references regarding "Miguel Flores, Tomas Jimon[,] and a person known as Banano[.]" Additionally, the Defendant argues that the State failed to establish the necessary requirements before referencing missing witnesses. The State responds that the trial court did not abuse its discretion when it allowed the State to cross-examine the Defendant regarding missing witnesses.

In Tennessee, "the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion." State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993); see State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994); State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994); see also Tenn. R. Evid. 611(a) (stating that the trial court has authority to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel"). "Absent a clear abuse of this discretion that results in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion." State v. Johnson, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984).

In certain situations, if a party fails to call a particular person as a witness, an inference may be drawn that had the person testified, the testimony would have been unfavorable to that party. See State v. Francis, 669 S.W.2d 85, 88 (Tenn. 1984). Before a party is permitted to invoke the missing witness rule,

> the evidence must show that [1] the witness had knowledge or material facts, [2] that a relationship exists between the witness and the party that would naturally incline the witness to favor the party; and [3] that the missing witness was available to process of the Court for trial." []Francis, 669 S.W.2d at 88 (quoting Delk v. State, 590 S.W.2d 435, 440 (Tenn. 1979)). "[W]hen it can be said 'with reasonable assurance that it would have been natural for a party to have called the absent witness but for some apprehension about his testimony,' an inference may be drawn by the jury that the testimony would have been unfavorable." Id. at 88-89 (quoting Burgess v. United States, 440 F.2d 226, 237 (D.C. Cir. 1970)); see also 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.16. However, the inference is not appropriate when the proof fails to establish all three of the Delk factors. See Francis, 669 S.W.2d at 88 n.3. Due to the "potentially critical effect of the missing witness rule," the Delk requirements must be strictly construed. Id. at 89.

State v. Whitaker, No. E2014-02330-CCA-R3-CD, 2015 WL 5179196, at *2 (Tenn. Crim. App. Sept. 4, 2015), perm. app. denied (Jan. 15, 2016). Furthermore, "[t]he inference may not be invoked when it is merely shown that (1) the witness 'may have some knowledge of the facts involved,' Francis, 669 S.W.2d at 88, or (2) the witness is equally available to both parties. State v. Boyd, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992)." State v. Walter Williams, No. W2009-02438-CCA-R3CD, 2011 WL 2306246, at *6 (Tenn. Crim. App. June 7, 2011).

-10-

First, we must consider whether the Defendant has waived this issue on appeal. The Defendant failed to make a contemporaneous objection when the prosecutor initially asked the Defendant why Miguel and Tomas were not present at trial. The Defendant replied that he did not know why, and the prosecutor continued questioning the Defendant about Miguel and Thomas without objection. Although the issue was raised by the Defendant on appeal, any error was unattended by a contemporaneous objection at trial. See Tenn. R. Evid. 103 (stating that a timely objection "stating the specific ground of objection" is necessary to preserve claim of erroneous admission of evidence); see also State v. Robert Simerly, No. E2002-02626-CCA-R3-CD, 2004 WL 443294, at *5 (Tenn. Crim. App. Mar. 11, 2004). Accordingly, the Defendant has waived our consideration of his claim that the prosecutor improperly questioned him as to why Miguel and Tomas were not at the trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

The Defendant first objected to the prosecutor's line of questioning about potential defense witnesses when the State asked the Defendant why Banano was not present at trial. Upon defense counsel's objection, a bench conference took place:

Defense counsel: Judge, I think these questions run afoul of . . . [the] burden of proof in this case being towards the State. [The Defendant] doesn't have to present any of these people, and I don't think the State should be allowed to argue inferences about them not being here.

The State: It's in the full scope of cross-examination. On direct examination he said he went to see his hairstylist. I'm asking about that, like any other witness.

Trial court: Well here's the deal. He's testifying. He's putting all kinds of things in the record. He's made all these things relevant. The State can certainly ask. The State can probably ask for a missing witness at this point in time. I mean, it's a situation where he's being pretty specific about stuff that obviously apparently nobody knew about. He's the only person that knows this.

Following the trial court's ruling, the State asked the Defendant the following questions regarding Miguel, Tomas, and Banano:

And you didn't think that you should reach out to any of these three people you mentioned Miguel, Tomas, Banano and ask them hey, I'm on trial for something I didn't do and y'all were with me, would you come and

-11-

help me out?  Would you talk to [the] police?  Would you go to the trial? Would you testify?

We conclude that the prosecutor's questions to which the Defendant objected and his questions following the bench conference regarding the Defendant's failure to call these witnesses were improper.  We do not agree that the prosecutor's questions following the bench hearing were simply within the scope of cross-examination because the Defendant introduced new information.  Though the State never specifically asked for a negative inference in accordance with the missing witness rule, the prosecutor nevertheless commented on the Defendant's failure to call witnesses, whose testimony would be expected to be favorable.  See State v. Michael D. Sweat, No. E2008-00423-CCA-R3-CD, 2010 WL 153038, at *20 (Tenn. Crim. App. Jan. 15, 2010) (holding that the prosecutor's comments during cross-examination regarding the Defendant's failure to call alibi witnesses were improper because the "proper Delk foundation was not laid before the State attempted to question the witness about other missing witnesses."). Here, the State failed to lay the proper Delk foundation before asking the Defendant about missing witnesses, and the trial court erred in allowing the State to proceed commenting on the missing witnesses without doing so.  Having determined that the prosecutor's remarks were improper, we must determine whether the improper remarks could have affected the verdict.  See Judge v. State, 539 S.W.2d 340, 344-35 (Tenn. Crim. App. 1976); Tenn. R. App. P. 36(b). ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

In Judge, this court set out considerations for determining if a prosecutor's conduct could have improperly prejudiced the defendant and affected the verdict:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

-12-

See Sweat, 2010 WL 153038, at *20 (applying these factors to a prosecutor's failure to establish the proper Delk foundation prior to asking the Defendant about missing witnesses).

Applying these factors, we first note that the Defendant waived review of the prosecutor's initial questions regarding Miguel and Tomas by failing to object when the prosecutor initially questioned the Defendant about these two witnesses. Though later in cross-examination the Defendant properly objected to the prosecutor's making further comments about the absence of Miguel, Tomas, and Banano, we conclude that the error did not likely effect the jury's verdict. Prior to the Defendant's objection, the prosecutor had already asked the Defendant, without objection, why Miguel and Tomas were not present at trial. During direct examination, the Defendant had testified that these two men, who were related to him by blood or marriage, were with him at the Prescott Place Apartments on the day of the incident. The jury would have been able to draw a negative inference about their absence prior to the Defendant's objection. Furthermore, the trial court instructed the jury that the law presumed the Defendant was innocent and that the Defendant was not required to prove his innocence. Additionally, during closing argument, the prosecutor reminded the jury to "please never forget that the burden of proof is on the State and it never shifts to the defense." Moreover, the evidence against the Defendant was strong. The victim identified the Defendant as the man who robbed him at gunpoint, and Mr. Vasquez saw the Defendant at the apartment complex on the day of robbery. Though the Defendant denied robbing the victim, he admitted to being at the apartment complex on July 4, 2015. Furthermore, we have already determined that the evidence against the Defendant was sufficient to sustain his conviction for aggravated robbery. Thus, in light of the Judge factors, we cannot say that the prosecutor's questions during cross-examination more probably than not affected the outcome of the trial. See Tenn. R. App. P. 36(b).

## CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-13-